Filed 5/12/15

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D066482 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. RIF1201945) |
| JUAN ANTONIO COVARRUBIAS, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of Riverside County, Richard T. Fields, Judge.  Affirmed.


Nancy L. Tetreault, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Anthony Da Silva and Peter Quon, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant and appellant Juan Antonio Covarrubias of second degree implied malice murder (Pen. Code, § 187). The court sentenced Covarrubias to prison for 15 years to life.

Covarrubias appeals, contending the court prejudicially erred when it refused to exclude certain portions of the testimony of two employees of Mothers Against Drunk Driving (MADD). Each of the MADD employees testified about various administrative matters pertaining to MADD, including victim impact panels, *and*, as relevant to this appeal, their own personal stories of tragedy related to drunk driving accidents (hereafter personal-tragedy testimony). Covarrubias alternatively contends the court erred by instructing the jury with CALCRIM No. 224, Circumstantial Evidence: Sufficiency of Evidence, instead of CALCRIM No. 225, Circumstantial Evidence: Intent or Mental State.

We conclude the court erred when it found the personal-tragedy testimony relevant under Evidence Code[1] section 350 and when it found under section 352 that such testimony was not substantially outweighed by its prejudicial effect. However, on this record, we further conclude this error was harmless. Finally, we conclude the court properly instructed the jury with respect to circumstantial evidence offered to prove the elements and intent of the crime. Affirmed.

## FACTS

On the morning of March 31, 2012, Covarrubias crashed the SUV he was driving into the rear of victim Gyla Walters's car while she was stopped at an intersection. The

---

[1] All further statutory references are to the Evidence Code unless otherwise noted.

impact pushed Walters's car into the intersection and caused her car to burst into flames. Covarrubias and Covarrubias's cousin emerged from the SUV. Covarrubias walked up to another car and offered one of its passengers $500 to drive him away from the scene. The passenger refused and then watched as Covarrubias unsuccessfully attempted to open a door of Walters's burning car. Covarrubias next tried to get into another car, but its driver sped off. Bystanders walked Covarrubias to the side of the road to wait for the police.

Covarrubias approached the first police officer who arrived at the scene and said, "I did it. I ran the red light. I killed – I killed a person." Covarrubias voluntarily put his hands behind his back, and the officer handcuffed him. The officer observed that Covarrubias smelled of alcohol, his speech was slurred, and his eyes were bloodshot. The officer transported Covarrubias to the police station, where his blood was drawn. A forensic toxicologist who analyzed the blood sample estimated Covarrubias's blood-alcohol level at 0.20 percent at the time of the crash.[2]

At the police station, another officer interviewed Covarrubias. Covarrubias admitted driving the SUV that crashed into Walters's car. He told the officer that he went to a nightclub with friends the previous night to celebrate his upcoming birthday. While there, he drank "[t]equila mix, tequila and vodka." He told the officer that he left the nightclub around two in the morning to go to a party where he drank more alcohol "for several hours." Covarrubias said his cousin warned him not to drive after leaving the party.

---

[2]    Covarrubias's blood was drawn about 60 to 90 minutes after the crash. The blood-alcohol level of that sample was 0.19 percent.

A traffic collision investigator testified that when he arrived on scene, Walters's car was burning. He concluded Walters died because of the fire.

DISCUSSION

I

Admissibility of the Personal-Tragedy Testimony

A. *Additional Facts*

Between August 2007 and February 2011, Covarrubias pled guilty three times for driving under the influence of alcohol (sometimes DUI). The court ordered Covarrubias to attend and complete alcohol abuse rehabilitation programs and MADD victim impact panels after each plea. The record indicates Covarrubias attended at least two of the MADD victim impact panels. MADD victim impact panels consist of victims of DUI crashes and their family members relating the physical and emotional pain they have suffered because of drunk driving accidents.

At trial, the People called two MADD employees, Sharry Graham and Desiree Garcia. Graham testified about her position as a "victim advocate" and provided information about MADD victim impact panels, such as the average attendance, the procedures MADD used to record attendees, and a description of the general content of the presentations. Garcia testified she was a development officer for MADD and briefly explained her job duties. Along with their roles as employees, Graham and Garcia regularly presented at MADD victim impact panels. The record shows both Graham and Garcia spoke at the MADD victim impact panels Covarrubias attended.

Graham testified that a drunk driver hit her son and that she often tells this "tragic story" at MADD meetings. She testified that in one MADD meeting attended by

4

Covarrubias, she described having to sign forms at the hospital indicating her son would likely die from the car crash. Although her son survived, she testified that she explains to attendees of MADD meetings "he's been reissued, because he is not the same boy I gave birth to." She also testified that her son is "[l]ike a newborn baby" because he has had to relearn "how to read . . . how to swallow, how to chew, how to dress himself, everything" and that he is "on a ventilator," has a "brain injury," and is "paralyzed on the left side."

Graham also testified about her son's suffering: "And while he was only 18 years old and getting ready to graduate from high school, that was never my plan for him, and that was never the plan for himself. And he still asks, How can somebody else decide how my life was going to be? [¶] . . . [A]nd I talk about how he cannot hold a job. He can't. That's not even within the realm of possibility. [¶] . . . [¶] And I also talk about the pain that he's in every day. [¶] And I talk about that he goes around thinking about suicide, because of the pain. That he doesn't know if he can live to be an old man and endure the pain that he does."

Garcia, like Graham, testified she appeared on MADD victim impact panels including at a meeting attended by Covarrubias. Garcia testified she was raised by a single mother. She depicted her mother as a selfless person who made daily sacrifices to raise Garcia, her only child. Garcia said her mother supported her while Garcia attended college. Garcia then talked about the morning the police informed her that her mother and her mother's boyfriend had been killed by a drunk driver: "I remember I was so mad, because I thought, Who had a right to have say on my life? Somebody that I didn't know. That didn't know me changed the entire course of how my life would be played out. That made me think how selfish, how selfish that somebody could have a couple hours of

5

laughs and drinks.  And what it came down to is that my mom's life was worth a couple shots of vodka."

Garcia also testified about the aftermath of the DUI crash:  "[N]ot only was my mom's life taken, but my mom was with her boyfriend, and his life was taken as well. And he was the father, a single father of a beautiful 11-year-old little girl.  [¶]  . . . Forget about me for a second, but there was an 11-year-old little girl left without a dad. . . .  [¶] The young man is serving a sentence.  He was convicted to 16.4 years in state prison. The law eight years ago was a little different, so that's what he was convicted of.  He has to serve 11 of those years.  [¶]  And when he gets out, he gets his life back.  But I'm the one with the life sentence, because I have to live with this for the rest of my life."

B.  *Guiding Principles*

Rulings made under sections 350 and 352 are reviewed for an abuse of discretion. (*People v. Foster* (2010) 50 Cal.4th 1301, 1328.)  "This standard is particularly appropriate when, as here, the trial court's determination of admissibility involved questions of relevance . . . and undue prejudice."  (*People v. Guerra* (2006) 37 Cal.4th 1067, 1113.)  "Under the abuse of discretion standard, 'a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' [Citation.]"  (*People v. Hovarter* (2008) 44 Cal.4th 983, 1004; see *People v. Kipp* (1998) 18 Cal.4th 349, 371 [noting a "court abuses its discretion when its ruling 'falls outside the bounds of reason'"].)

1.  Sections 350 and 352

Section 350 states: "No evidence is admissible except relevant evidence."

"""Relevant evidence is defined in Evidence Code section 210 as evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." The test of relevance is whether the evidence tends "'logically, naturally, and by reasonable inference' to establish material facts such as identity, intent, or motive. [Citations.]" [Citation.] The trial court has broad discretion in determining the relevance of evidence [citations] but lacks discretion to admit irrelevant evidence. [Citations.]"" [Citation.]" (*People v. Hamilton* (2009) 45 Cal.4th 863, 913.)

Section 352 states: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "'The code speaks in terms of *undue* prejudice. Unless the dangers of undue prejudice, confusion, or time consumption "'substantially outweigh'" the probative value of relevant evidence, a section 352 objection should fail. [Citation.] "'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging."' [Citation.]" [Citation.]'" (*People v. Doolin* (2009) 45 Cal.4th 390, 439.)

### 2. Implied Malice

Malice may be implied in DUI crashes: "[W]hen the conduct in question can be characterized as a wanton disregard for life, and the facts demonstrate a subjective awareness of the risk created, malice may be implied. (§ 188.) In such cases, a murder

7

charge is appropriate." (*People v. Watson* (1981) 30 Cal.3d 290, 298.) Additionally, "[p]rior convictions and exposure to mandatory educational programs are admissible to show the accused's awareness of the life threatening risks of driving under the influence." (*People v. David* (1991) 230 Cal.App.3d 1109, 1115 (*David*).) Thus, an instructor's discussion of an educational program that a defendant attended, including the "legal aspects of driving under the influence . . . and the long-term effects of alcohol on organs of the body," is probative to show the defendant's implied malice and is not unduly prejudicial. (*People v. Murray* (1990) 225 Cal.App.3d 734, 739 (*Murray*).)

Furthermore, testimony of how "even small amounts of alcohol could impair the nervous system, the muscles, and the brain and lead to problems of judgment and lack of coordination . . . , [how] alcohol impairs the ability to make rational decisions and to judge distance and speed . . . [and how] alcohol reduces inhibitions and causes drivers to take abnormal chances, such as speeding and dodging in and out of traffic," is another example of probative evidence that is not unduly prejudicial. (*Murray*, *supra*, 225 Cal.App.3d at p. 739.)

Conversely, evidence that is "highly emotional," "unrelated to the charged offense," and "create[s] a substantial danger of inflaming the jury's passions by engendering similar feelings of sympathy for the victims of the charged offenses and their families," exemplifies unduly prejudicial evidence. (*People v. Diaz* (2014) 227 Cal.App.4th 362, 379-380 (*Diaz*).)

In *Diaz*, the defendant was driving over 100 miles per hour when his car hit a curb, flipped on its side and crashed. (*Diaz*, *supra*, 227 Cal.App.4th at p. 367.) One of the passengers in Diaz's car died at the scene. (*Ibid*.) An expert determined that Diaz had

8

between a 0.22 and 0.23 percent blood-alcohol level at the time of the crash. (*Ibid*.) Before the crash, Diaz had pled guilty to two prior DUI convictions and had been ordered to attend both an alcohol education program called Maximizing Access to Advance Our Communities (MAAC) and a MADD education class. (*Id.* at p. 368.)

Diaz was charged with murder among other crimes. (*Diaz*, *supra*, 227 Cal.App.4th at pp. 364-365.) At Diaz's first trial, the jury could not return a verdict on the murder charge. (*Id.* at p. 365.) At retrial, the People showed videos to the jury that Diaz had seen at his MAAC and MADD education classes. (*Ibid*.) The 29-minute MAAC video showed inmates, victims and family members of victims of DUI and reckless driving accidents in Delaware. (*Id.* at pp. 370-373.) It also showed a defense attorney and prosecutor talking about the high conviction rates for defendants charged with DUI in Delaware, and a judge proclaiming that punishment is the "'only message people truly understand.'" (*Id.* at pp. 371-372.) The 33-minute MADD video included the stories of two parents whose children had been killed in DUI crashes. (*Id.* at pp. 375-376.)

The trial court in *Diaz* gave the jury a curative instruction about the MAAC video, admonishing the jury to disregard the punishments imposed on the inmates in the video and any of the statements made in the video by the lawyers or the judge. (*Diaz*, *supra*, 227 Cal.App.4th at p. 374.) Further, the trial court ruled that the MAAC video was "demonstrative only." (*Id.* at p. 375.) The jury at Diaz's retrial convicted him of murder. (*Id.* at p. 365.)

On appeal, this court held the trial court prejudicially erred in permitting the jury to view both videos because it "created a substantial danger of inflaming the jury's

9

passions by engendering similar feelings of sympathy." (*Diaz*, *supra*, 227 Cal.App.4th at p. 380.) This court indicated that not only were the stories recounted in the videos highly prejudicial because of the vivid descriptions of the accidents and the tragic consequences, but also that at least two of the stories bore a striking resemblance to Diaz's case. (*Ibid*.) Also, the videos showed many pictures of the victims, pictures of grave markers, pictures of the scenes of the crashes, and footage of a brain-damaged victim that our court concluded were likely to inflame the jury's passions. (*Id*. at pp. 380-381.)

Finally, this court in *Diaz* concluded the MAAC video's discussion of conviction rates for drunk drivers by the defense attorney and the prosecutor, the Delaware judge's declarations about deterrence, and the inmates' statements about their sentences "were highly prejudicial in that they suggested to the jury that it would be acting in an aberrant fashion if it were to find Diaz not guilty." (*Diaz*, *supra*, 227 Cal.App.4th at p. 381.)

Here, there is no dispute that Graham's and Garcia's testimony regarding the general character of the MADD victim impact panels, and their verifications that Covarrubias attended the panels at which they presented their stories, was highly probative on the issue of implied malice, which, as noted *ante*, requires a showing of the accused's *subjective* awareness of the life threatening risks of DUI. (*David*, *supra*, 230 Cal.App.3d at p. 1115.) The question then becomes whether the court abused its discretion when it found the personal-tragedy testimony relevant and determined the probative value of such evidence was not substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice. (See §§ 350 & 352, subds. (a) & (b).)

10

We conclude the court abused its discretion when it found the personal-tragedy testimony admissible under section 350. Quite simply, the tragic aftermaths of the DUI crashes experienced by Graham and Garcia and their respective family members were wholly unrelated to Covarrubias's charged offense, including whether he acted with the requisite implied malice.

Moreover, assuming for the sake of argument such testimony was even marginally relevant, we further conclude the court erred when it failed under section 352 to exclude such evidence because it "created a substantial danger of inflaming the jury's passions by engendering similar feelings of sympathy." (See *Diaz*, *supra*, 227 Cal.App.4th at p. 380.) Indeed, like portions of the evidence in *Diaz*, the personal-tragedy testimony of Graham and Garcia was highly prejudicial as each described in detail the drunk driving accidents involving their respective family members and the tragic consequences of such accidents on them and their respective families. (See *id*. at pp. 380-381.)[3] The court therefore abused its discretion when it found the personal-tragedy testimony was not unduly prejudicial.

C. *Harmless Error*

Although the trial court erred when it ruled to admit the personal-tragedy testimony, we conclude that error was harmless under any conceivable standard. (See

---

[3] It is hard to imagine a jury *not* being inflamed by such testimony. When the prosecutor asked Graham to share her story of tragedy with the jury, the record shows Graham responded by saying, "Actually, we don't call them our stories. We call them our lives, because it's real." We certainly mean no disrespect to either Graham or Garcia and the tragedies to their families caused by drunk drivers. We are troubled, however, by the admission of such evidence given its minimal, if any, relevance and its substantial prejudicial impact/effects.

11

*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*); *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*); *People v. Marks* (2003) 31 Cal.4th 197, 227 [noting that application of "ordinary rules of evidence like . . . section 352 does not implicate the federal Constitution, and thus we review allegations of error under the 'reasonable probability' standard" in *Watson*].)

When the admission of evidence is challenged, the reviewing court determines whether the abuse of discretion was harmless based "upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 684.)

Here, even without the personal-tragedy testimony, there is overwhelming evidence in the record supporting the finding of implied malice.[4] Besides Graham and Garcia, the People called four other witnesses who spoke at mandatory alcohol education programs that Covarrubias also attended. Not only did these witnesses inform Covarrubias of the potential catastrophic consequences of driving under the influence, but at least three of the programs also included advisements or similar warnings as established in *People v. Watson*, *supra*, 30 Cal.3d at page 298. Furthermore, before the

---

[4]    Given this conclusion, it is even more concerning why the trial court ruled to admit, and the prosecution sought to admit, the personal-tragedy testimony.

accident, Covarrubias already had suffered three prior DUI convictions and had attended court-ordered alcohol education programs and MADD victim impact panels.

Finally, and perhaps most importantly, Covarrubias's admissions to the first officer on the scene and to the officer who subsequently interviewed him at the station also support a finding of implied malice. When the first police officer arrived at the accident scene, Covarrubias exclaimed, "I did it. I ran the red light. I killed – I killed a person." Covarrubias next put his hands behind his back and the officer handcuffed him. Later at the police station, Covarrubias told another officer, "[t]he thing that upsets me most is that I was such a fucking idiot I took somebody else's life." Covarrubias also said his cousin warned him not to drive before they left the party. In light of this evidence, we conclude Covarrubias has not established prejudicial error under either *Chapman* or *Watson*.[5]

II

Jury Instructions

A. *Additional Facts*

At trial, the defense objected to the court giving jury instruction CALCRIM No. 224.[6] Instead, the record shows the defense wanted the court to instruct the jury with CALCRIM No. 225.[7]

---

[5] Because we have analyzed and decided the merits of Covarrubias's appeal, we need not address whether Covarrubias forfeited his claims concerning Graham's and Garcia's personal-tragedy testimony by failing to object at trial, as the People alternately contend.

[6] CALCRIM No. 224 states: "Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a

13

In refusing to give CALCRIM No. 225, the court found that "much of this case relies upon circumstantial evidence. For example . . . we heard no testimony that anyone saw the defendant drinking that night. So the circumstantial evidence that he was drinking and that he was impaired comes from the officers. For example, testimony that his eyes were bloodshot and watery; his speech was slurred; that the blood alcohol result of .19. All of those are circumstantial pieces of evidence that the defendant was impaired."

---

reasonable doubt. [¶] Also, before you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty. If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

7    CALCRIM No. 225 states: "The People must prove not only that the defendant did the act[s] charged, but also that (he/she) acted with a particular (intent/ [and/or] mental state). The instruction for (the/each) crime [and allegation] explains the (intent/ [and/or] mental state) required. [¶]  A[n] (intent/ [and/or] mental state) may be proved by circumstantial evidence. [¶]  Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt. [¶]  Also, before you may rely on circumstantial evidence to conclude that the defendant had the required (intent/ [and/or] mental state), you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant had the required (intent/ [and/or] mental state). If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions supports a finding that the defendant did have the required (intent/ [and/or] mental state) and another reasonable conclusion supports a finding that the defendant did not, you must conclude that the required (intent/ [and/or] mental state) was not proved by the circumstantial evidence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

14

B. *Analysis*

"CALCRIM No. 224 is a form jury instruction that describes the manner in which the jury is to consider circumstantial evidence that the prosecution offers to prove facts necessary to find a defendant guilty. . . . [¶] CALCRIM No. 225 is a form jury instruction that describes the manner in which the jury is to consider circumstantial evidence that the prosecution offers to prove a defendant's intent or mental state." (*People v. Contreras* (2010) 184 Cal.App.4th 587, 591-592.) The bench notes for CALCRIM No. 224 state that "[i]f intent is the only element proved by circumstantial evidence, do not give this instruction. Give CALCRIM No. 225." (CALCRIM No. 224.)

Here, intent was not the only element proved by circumstantial evidence. As the court correctly noted, whether Covarrubias was driving under the influence at the time of the crash depended upon circumstantial evidence presented by the prosecution. Covarrubias, however, asserts that his admissions of guilt, including his statements to the officers that he was drinking the night of and in the early morning prior to the crash, unequivocally confirmed that he was driving under the influence at the time of the crash and the collision caused the fire that killed the victim. We disagree.

Although Covarrubias admitted to drinking before the crash, the prosecution still had to prove whether he was driving under the influence at the time of the crash, which occurred *hours* later. Moreover, Covarrubias cross-examined witnesses who denied ever

15

seeing him drink at the nightclub or the party, and he presented evidence that challenged the presumption that the collision caused the fire.[8]

Accordingly, because intent was not the only element to be proved by circumstantial evidence, we conclude the court properly instructed the jury with CALCRIM No. 224. In any event, we note that even if the court erred in giving the jury CALCRIM No. 224 and not CALCRIM No. 225, that error was harmless in light of our previous discussion of the overwhelming evidence of defendant's guilt. (See *Neder v. United States* (1999) 527 U.S. 1, 17-18 [noting overwhelming evidence of guilt rendered alleged instructional error harmless beyond a reasonable doubt].)

### DISPOSITON

The judgment of conviction is affirmed.


BENKE, Acting P. J.

WE CONCUR:


NARES, J.


McINTYRE, J.

---

[8] Covarrubias presented a witness who testified he saw another vehicle drive through the intersection at the time of the crash that allegedly caused a spark, which allegedly ignited the victim's car.

16