Filed 7/28/15  P. v. Betancourt CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B259043 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA415177) |
| v. | |
| LEROY BETANCOURT, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Drew E. Edwards, Judge.  Affirmed as modified.

Donna Ford, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, and John Yang, Deputy Attorney General, for Plaintiff and Respondent.

————————————

A jury convicted Leroy Betancourt of two counts of robbery and one count of assault with a firearm. He appeals, and we affirm as modified.

## BACKGROUND

An information filed October 22, 2013 charged Betancourt with three counts of second degree robbery against Sona Gevorgian (count 1), Raymond Aladadyan (count 2), and Arsen Ter (count 3), all in violation of Penal Code section 211.[1] The information also alleged in count 4 that Betancourt committed assault with a firearm on Gevorgian in violation of section 245, subdivision (a)(2). As to all four counts, the information alleged that Betancourt personally used a firearm (§§ 1203.06, subd. (a)(1), 12022.5, subd. (a)), served a prior prison term (§ 667.5, subd. (c)), and had a prior conviction for a serious felony (§ 667, subd. (a)(1)), which constituted a strike (§§ 1170.12, subd. (b), 667, subds. (b)–(j)). The trial court granted Betancourt's motion for judgment of acquittal as to count 3.

After trial, the jury convicted Betancourt of count 1 (robbery of Gevorgian), count 2 (robbery of Aladadyan), and count 4 (assault with a firearm on Gevorgian). The jury found true that Betancourt personally used a handgun against Gevorgian in counts 1 and 4, and found not true that Betancourt personally used a handgun against Aladavyan in count 2. Betancourt admitted his prior conviction.

At sentencing, the trial court granted Betancourt's motion to strike his prior conviction under section 1385. The court imposed a total of 20 years in state prison: three years on count 1 plus 10 years on the firearm enhancement, and five years for the prior serious felony enhancement; one year on count 2; and one year on count 4. Betancourt was ordered to pay fines and penalties, and was awarded custody credits. He filed this timely appeal.

At trial, Gevorgian testified that she worked as a receptionist at a medical marijuana clinic on South Crenshaw Boulevard in Los Angeles. At 4:00 p.m. on August 6, 2013, Betancourt entered the lobby. Betancourt approached the glass partition

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

behind which Gevorgian worked, and where she could buzz clients through a security door and into the actual dispensary. She told Betancourt to fill out a form, and he returned the form to her with his doctor's recommendation and an identification card. Gevorgian was not sure what kind of identification it was, but "[i]t wasn't California," and she told him she could not accept it. Betancourt said his girlfriend had his California identification, and he could get it in a few days. Ter, who also worked there, came to the lobby and explained things to Betancourt, who thanked them and left.

A couple of hours later, Betancourt returned, came back to Gevorgian's window, and presented a valid California identification. She said, "'Oh, I am glad you got it,'" made a copy of the card, and buzzed him in, prepared to give him back his identification. A photograph of the identification was introduced into evidence. Betancourt took a quick glance to his right, grabbed Gevorgian's left arm with his left arm, and with his right arm pointed a small black handgun at her neck by her jaw line. Gevorgian was terrified. Betancourt told her to stay calm and asked if there was anyone else inside; she said no. He asked where the cash and the safe were, and she pointed toward the safe. Betancourt said, "'Stay on the floor. This will all be over quick.'" Gevorgian got on the floor, and Betancourt grabbed cash and a big bag of marijuana from the safe. Betancourt buzzed the door open and went back into the lobby, letting a second man in from outside. Betancourt asked, "'Is there any other way out of here? . . . You better not be fuckin' lying to me.'"

Ter and another employee, Aladadyan, entered the lobby, asking why the door was locked. The second man pistol-whipped Aladadyan; Gevorgian heard him fall and heard a shot fired. With Betancourt waiting by the buzzer door, the second man entered from the lobby. Telling Gevorgian to keep her head on the ground, the second man grabbed 10 to 12 jars of marijuana from the shelves and took two laptops. He wanted to take her phone, and she begged him not to. He said, "'You better not call the fuckin' cops.'" Betancourt and the second man left together.

Los Angeles Police Department Detective Ryan Williams testified that Betancourt was the primary suspect because the fraudulent California driver's license left at the

3

scene bore his name, date of birth, and photograph (and someone else's driver's license number). A surveillance team picked up Betancourt, and Detective Williams and another detective interviewed him at the police department on August 14, 2013; a videotape of the interview was played for the jury. In the interview, Betancourt said he committed the robbery because he needed rent money and had just had a baby. He planned the robbery over several days with someone named Kevin who he met at a bus stop, and who had been a customer of the dispensary. On the day of the robbery, Betancourt tried to enter the dispensary with "[his] prison id that [he] paroled with in 2009. And they told [him] they can't use that." (When Betancourt again referred to his "[p]rison ID," Detective Williams responded, "Your CDC [California Department of Corrections] card basically," and Betancourt said, "Right." Betancourt later referred to it as "the CDC card.") Betancourt left and bought fake paperwork for about $60. When he returned, a woman buzzed him in. He told her "just lay down, and you're gonna be fine. All I want is a little bit of cash, and whatever else you got." Kevin came in behind him, and the gun was Kevin's. They took around $500 and "a little bit of weed." Betancourt did not know about anyone getting beaten, and he thought Kevin probably fired a shot in the air. After he and Kevin left the dispensary, they split the money and the marijuana, and Betancourt jumped on a bus.

Aladadyan testified that he worked with Ter and Gevorgian at the dispensary. On the day of the robbery, he left the dispensary for about 10 minutes to get something to eat. When he and Ter returned, the front door was locked, which was unusual. Ter screamed to open the door. When the door opened, Ter walked in first. Aladadyan followed, was hit on the head from behind with a gun, fell to the floor, and blacked out. When he came to, he was missing $4,000 of his own money that he had had with him when he left the store. Also gone were cash from the store and $10,000 worth of marijuana. Gevorgian was scared and crying.

In closing, Betancourt's counsel repeated his concession in opening argument that Betancourt committed a commercial burglary, but argued the evidence did not show beyond a reasonable doubt that he personally used a firearm.

4

**DISCUSSION**

**I.     Admitting evidence of Betancourt's prison identification card was harmless error.**

Before testimony began, Betancourt's counsel moved to exclude Betancourt's statements in the police interview in which he described the first identification he showed at the dispensary as his prison identification, and subsequent references to the identification as his CDC or prison card by Detective Williams and by Betancourt. The court denied the motion, stating that the evidence was not more prejudicial than probative. Counsel renewed the motion the next day, arguing that the card was not in evidence. Gevorgian had testified at the preliminary hearing that she did not know what kind of an identification it was, and she would testify only that she would not accept the first identification. Allowing testimony that it was a prison identification card would "essentially say[] that [he has] been to prison before." The court stated it would not change its ruling, and admitted the references to the document as Betancourt's prison identification. In his opening statement, the prosecutor stated that Betancourt "present[ed] the clerk or the receptionist at the front area with a state prison I.D.," and the jury heard the entire interview with Detective Williams.

On appeal, Betancourt argues that the statements that the rejected identification was Betancourt's prison identification card were more prejudicial than probative, and the trial court abused its discretion in admitting the evidence. We review for an abuse of discretion the trial court's determination that the evidence was more probative than prejudicial under Evidence Code section 352. (*People v. Covarrubias* (2015) 236 Cal.App.4th 942, 947.) An objection under the statute should fail "'[u]nless the dangers of undue prejudice . . . "'substantially outweigh'" the probative value of relevant evidence.'" (*Id*. at p. 948.)

We see no probative value in the evidence that the identification card that Betancourt initially attempted to use at the dispensary was from the CDC. The card itself was not in evidence. Gevorgian testified that Betancourt's first identification card was not a standard California identification, although she did not know what kind it was, and

5

so she did not accept it.  The only evidence that the card was from the CDC were Betancourt's statements and Detective Williams's references to the CDC in the videotape of the detective's interview with Betancourt.  These subsequent references to the identification as from the California prison system added nothing to the strength of Gevorgian's testimony and were not probative in themselves.

Allowing references to the identification as a prison or CDC card, however, was unduly prejudicial, as the term constituted evidence that Betancourt had been in prison, which "'''''"uniquely tends to evoke an emotional bias against the defendant as an individual and . . . has very little effect on the issues."''''''"  (*People v. Covarrubias*, *supra*, 236 Cal.App.4th at p. 948.)  The jury heard in opening argument that Betancourt attempted to gain entry with a prison identification card.  The subsequent references to the CDC card tended to prove only that Betancourt had been convicted of a crime and had served prison time.  The source of the identification card was not relevant to any permissible fact such as motive, intent, or knowledge, and as the card was not in evidence it was not proof of identity.  (Evid. Code, § 1101, subd. (b).)  The evidence that the first identification was from the CDC was substantially more prejudicial than probative, and it was an abuse of discretion to admit it.

We also conclude, however, that the error was harmless under any conceivable standard.  (*People v. Covarrubias*, *supra*, 236 Cal.App.4th at p. 951.)  Even without the admission of evidence that the first identification was from the CDC, there was strong evidence supporting the jury's guilty verdict.  Gevorgian identified Betancourt at trial.  Betancourt left behind at the scene his second identification, the false driver's license carrying his name, birthdate, and photograph.  A photograph of the false license was in evidence.  In his interview with the police Betancourt confessed to the robbery, giving details similar to Gevorgian's testimony.  Betancourt would have been convicted even without the CDC references.

## II. Betancourt's motion to suppress his interview statements was properly denied.

Before trial, Betancourt's counsel also moved to suppress the entire interview by Detective Williams on the ground that Betancourt never expressly waived his right to remain silent. The court stated, "this is the classic case of an implied waiver," and denied the motion. On appeal, Betancourt argues that the motion should have been granted because he was not advised of his rights "contemporaneously with, or even close in time to, [his] arrest," and in any event he did not make an implied waiver of his rights.

Betancourt was arrested on August 14, 2013. Officer Williams testified that Betancourt did not flee from the surveillance team that arrested him, signed a consent to search his house, and sat down to talk voluntarily. The interview took place in an interview room at the detectives bureau. Detective Williams told Betancourt to take a seat, and "He'll put the cuffs in front." Betancourt asked, "It wouldn't be too much if I call somebody and let [th]em know where I'm at?" Detective Williams responded, "You're gonna get an opportunity for all that. I promise you . . . We just gotta get through some things first . . . . [¶] . . . Cause you are in custody I gotta read you your rights, alright. I need a yes or no answer, alright. You have the right to remain silent. Do you understand?" Betancourt answered, "Yes." Detective Williams continued, "Anything you say may be used against you in court. Do you understand?" Betancourt answered, "Mmm, sorta. You know part ***." Detective Williams continued, "Do you understand anything that you say . . . [¶] . . . [¶] [c]an be [used] against . . . [¶] . . . [¶] . . . you in court," with Betancourt responding "yeah" four times. Detective Williams went on, "Okay. You have the right to a presence of an attorney before and during any questioning. Do you understand?" and Betancourt responded, "Um, yes." The detective continued, "If you can't afford an attorney one will be appointed for you free of charge before any questioning if you want. Do you understand?" and Betancourt answered, "Yes." After a short exchange about Betancourt's handcuffs, Detective Williams asked Betancourt what happened, and Betancourt began to describe the robbery.

"In general, if a custodial suspect, having heard and understood a full explanation of his or her *Miranda* [*v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694]] rights, then makes an uncompelled and uncoerced decision to talk, he or she has thereby knowingly, voluntarily, and intelligently waived them. [Citation.] Law enforcement officers are not required to obtain an express waiver of a suspect's *Miranda* rights prior to a custodial interview. [Citation.] Rather, a valid waiver of *Miranda* rights may, as here, be inferred from the defendant's words and actions." (*People v. Cunningham* (July 2, 2015, S051342) __ Cal.4th __ [2015 Cal. Lexis 4523, 56].) We evaluate "whether the *Miranda* waiver is shown by a preponderance of the evidence to be voluntary, knowing and intelligent under the totality of the circumstances surrounding the interrogation." (*People v. Sauceda-Contreras* (2012) 55 Cal.4th 203, 219.)

Betancourt argues that his "Mmm, sorta" response to Detective Williams' question whether he understood that anything he said could be used against him in court shows that he did not understand his right to appointed counsel. "'"[W]hen a suspect under interrogation makes an ambiguous statement that could be construed as an invocation of his or her *Miranda* rights, 'the interrogators may *clarify* the suspect's comprehension of, and desire to invoke or waive, the *Miranda* rights.'"'" (*People v. Sauceda-Contreras*, *supra*, 55 Cal.4th at p. 217.) The transcript shows that Detective Williams then repeated the question, and Betancourt answered "yeah" and "yes" several times. His actions imply a knowing and intelligent waiver of his rights.

Betancourt argues that his statement was not voluntary, because when he asked if he could call someone, Detective Williams responded he could do so but first Detective Williams had to "get through some things first," including reading Betancourt his rights. Because the interview took place after his arrest by the surveillance team, after he signed a consent to search his home, and after the search of his residence, Betancourt characterizes his interrogation as following a "[l]engthy and [i]ncommunicado [i]ncarceration." Betancourt did not make this voluntariness argument in the trial court. As a result, there are no findings of fact to support or disprove his claim that there was a lengthy period between his arrest and the interview that same day, or that the search of

his house took place prior to the interview. Further, there is no requirement that a suspect be allowed to make a telephone call before he is given *Miranda* warnings and interviewed while in custody. Betancourt stated he just wanted to advise someone of his whereabouts, and he does not claim he was denied an opportunity to do so later.

Most importantly, *Miranda* warnings are not required at the time of arrest, but only before a suspect is questioned while deprived of his freedom: "Absent 'custodial interrogation,' *Miranda* simply does not come into play." (*People v. Mickey* (1991) 54 Cal.3d 612, 648.) However short or long the period between Betancourt's arrest and his interview by Detective Williams, there is no evidence that he was interrogated earlier. The transcript supports a conclusion that before Betancourt was interrogated at the detectives bureau, he acted voluntarily, knowingly, and intelligently in making an implied waiver of his *Miranda* rights.

### III. Betancourt's sentence on count 4 must be stayed.

Betancourt argues, and respondent agrees, that the trial court should have stayed the prison term he received for count 4 (assault with a firearm on Gevorgian), as that count was predicated on the same act and the same victim as count 1 (robbery of Gevorgian), both with an allegation of personal use of a firearm.

Section 654, subdivision (a), provides: "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." Section 654, subdivision (a) permits multiple convictions, but bars multiple punishments, for a single, indivisible course of criminal conduct. (*Neal v. State of California* (1960) 55 Cal.2d 11, 18–19.) "Whether a course of criminal conduct is divisible . . . depends on the intent and objective of the actor. If all the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Id.* at p. 19; *People v. Latimer* (1993) 5 Cal.4th 1203, 1208.) We review this contention even though it was not raised in the trial court. (*People v. Scott* (1994) 9 Cal.4th 331, 354 & fn. 17.)

9

Betancourt's robbery and assault with a firearm on Gevorgian were an indivisible course of criminal conduct.  The assault charge was based on Betancourt's holding a gun to Gevorgian's jaw line during the robbery, and a single intent and objective underlay the series of acts comprising the assault and the robbery.  The two-year sentence on count 4 must be stayed.

## DISPOSITION

The judgment is modified to stay, pursuant to Penal Code section 654, the sentence on count 4.  The superior court is directed to prepare an amended abstract of judgment reflecting this modification and to forward a copy to the Department of Corrections and Rehabilitation.  As so modified, the judgment is affirmed.

NOT TO BE PUBLISHED.


JOHNSON, J.


We concur:


ROTHSCHILD, P. J.


CHANEY, J.