Filed 1/15/16  P. v. Arias CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>JUAN LOPEZ ARIAS,<br><br>　　　Defendant and Appellant. | D068680<br><br><br>(Super. Ct. No. FWV1103094) |

APPEAL from a judgment of the Superior Court of San Bernardino County, Jon D. Ferguson, Judge.  Affirmed.

David McNeil Morse, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler and Julie L. Garland, Assistant Attorneys General, Charles C. Ragland and Paige B. Hazard, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Juan Lopez Arias of first degree murder (Pen. Code,[1] §§ 187, subd. (a), 664, subd. (a)) and found he personally used and discharged a firearm causing death (§ 12022.53, subds. (b)-(d)).  The trial court sentenced Arias to a term of 50 years to life in prison as follows:  25 years to life for first degree murder and 25 years to life for discharging a firearm.

On appeal, Arias's sole contention is that the trial court abused its discretion by admitting into evidence a recording of a 911 telephone call.  We affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

*Arias's Termination from Arlon*

Arias worked at Arlon, Inc. (Arlon) for 33 years.  During his last three years there, Arlon suspended Arias without pay three times because he had committed "very serious" production mistakes.  Coworkers complained Arias acted inappropriately towards them, including making unwelcome romantic comments to a female coworker, who felt uncomfortable.  Arlon had warned Arias that he would be fired if the problems continued.  Arias had accused Robert Davalos, an Arlon maintenance worker, of spreading rumors about him, calling him names, and challenging him to fights.  A few months before the shooting, Arias told Javier Landeros that he would kill Davalos, and Landeros informed Davalos of the threat.

At 7:30 a.m. on December 1, 2011, Arlon terminated Arias's employment because of his "overall unsatisfactory work performance" and "unacceptable conduct."  Human

---

[1]     All statutory references are to the Penal Code unless otherwise stated.

resources manager Mary Peralta banned Arias from returning to Arlon without her approval. When Arlon personnel escorted Arias from the premises, Arias was wearing the latex gloves he used for work.

Approximately 30 minutes later, Arias retrieved a handgun from his home and returned to Arlon to confront Davalos, who was inside an office in the maintenance room, and shot him in the head four times. Arias threw the gun in a dumpster and threw his latex gloves on the ground before driving home.

Guillermo Castaneda testified he heard three loud noises coming from the direction of the maintenance room. Castaneda went on a scheduled break at 9:00 a.m. and found Davalos in a "monstrous pool of blood."

*The 911 Call*

Plant manager Chung Chiu arrived shortly afterwards. At 9:01 a.m., Chiu called 911. Chiu told the dispatcher that Arlon had fired an employee who had later returned to the business. Chiu believed Davalos had been beaten and said, "Hurry, hurry up we, we need a paramedic now." Chiu also reported that Davalos was unconscious, bled from his nose, and did not have a pulse. In response to the dispatcher's instructions, Chiu told the other employees to lay Davalos on his back. Chiu later told the dispatcher that Davalos was shot in the back of the head and was not breathing. The dispatcher instructed Chiu to perform CPR. Chiu counted with the dispatcher in an even tone to keep track of CPR chest compressions. Another Arlon employee, Erick Vasquez, continued to perform CPR and followed Chiu's count. Chiu said Davalos did not have a pulse, but the dispatcher instructed Chiu to continue administering CPR. Chiu told the dispatcher that there were

3

three or four bullet or bullet casings in the room and asked, "Where's the paramedics?" After the paramedics took control of the situation, Chiu identified Davalos as the victim and Arias as the suspect. The telephone call lasted 12 minutes.

*Arias's Arrest and Police Interview*

That same day, members of the San Bernardino County Sheriff's Department recovered the gun, four latex gloves, bullet fragments, and three bullet casings found in and around the crime scene. Arias's fingerprint matched a print on one of the latex gloves. The parties stipulated that three of the bullets recovered from Davalos's body were linked to the gun Arias threw in the dumpster.

San Bernardino County Sheriff's deputies arrested Arias at his home. During an interview with detectives, Arias initially denied returning to Arlon and injuring Davalos. He later told detectives multiple versions of a confrontation where he injured Davalos in self-defense. Arias eventually admitted that he returned to Arlon with a gun and killed Davalos. He also said he would kill Davalos again if he had the opportunity.

*Trial Proceedings*

During motion in limine proceedings, the trial court listened to a recording of Chiu's 911 call. Defense counsel objected to the introduction of the recording as cumulative and "very emotion-provoking" under Evidence Code section 352. Defense counsel argued: "[W]e know that Mr. Arias shot and killed this man. There is literally no dispute as to that. . . . [T]here are no witnesses to that shooting. None. Other than Mr. Arias, of course. . . . The prosecution is going to call eight or ten civilians from our line up to talk about both prior conflicts that Mr. Arias had with Mr. Davalos, but also

4

their observations on the morning of the shooting of my client walking in, walking out, when he got fired. . . . [A]ll of that stuff that might otherwise be covered in a 911 call is going to be covered in testimony." Defense counsel concluded that if the 911 call is "going to be probative of any issue, I think it would become cumulative then to cover that same stuff with a live witness."

The prosecutor asserted the recording provided "audio insight" into a critical period of time to rebut Arias's self-defense theory, and it added credibility and context to the witnesses' testimony. The prosecutor acknowledged that the recording was "a little bit emotional," but in light of the circumstances surrounding the violent crime, concluded, "[t]hat's just emotional by its inherent nature." The prosecutor reiterated that the recording provided "insight into the timing, the duration of the event, the sequence of events, [and] the fact that Mr. Arias was no longer there, but had been seen before."

The court found the recording constituted "a different type" of evidence and overruled defense counsel's objection. The court described Chiu as "remarkably calm" and "not particularly emotional," and found that the recording was probative of the employees' observations of the victim, the victim's injuries and the timing of events and discoveries. The court concluded that the recording could be used to corroborate oral testimony.

During Vasquez's testimony, the prosecutor played the 911 recording for the jury. Vasquez testified he was present for the call and conducted CPR on Davalos while Chiu counted.

5

A forensic pathologist testified regarding the results of her autopsy and evaluated photographs and diagrams of Davalos's gunshot wounds. A San Bernardino County Sheriff's Department detective processed the crime scene on the day of the shooting and evaluated photographs of Davalos's body, as well as photographs of blood splatter and pooling in the office.

Arias testified at trial about his history of depression, and claimed self-defense. Nonetheless, he admitted shooting Davalos. He also admitted owning the gun matching the bullets recovered from Davalos's body. Arias said he considered shooting Davalos a week earlier, and previously told an employee he would kill Davalos.

DISCUSSION

Arias contends the trial court abused its discretion by admitting the recording of the 911 call, which had minimal probative value and created a substantial danger of undue prejudice. He specifically argues the recording "appealed to the jurors' sense of sympathy, not only for the victim, but for those attempting to administer CPR to the victim to save his life, and shifted attention from the circumstances of the shooting to the impact of the shooting on the people at Arlon."

A. *Legal Principles*

Evidence Code section 352 states: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "We review for abuse of discretion a trial court's rulings on relevance and admission or exclusion of

6

evidence under Evidence Code section 352, including photographic and tape-recorded evidence." (*People v. Streeter* (2012) 54 Cal.4th 205, 237.) This standard is particularly appropriate when, as here, the trial court's determination of admissibility involved questions of undue prejudice. (See *People v. Guerra* (2006) 37 Cal.4th 1067, 1113, overruled on another ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151.) "A proper exercise of discretion is ' "neither arbitrary nor capricious, but is an impartial discretion, guided and controlled by fixed legal principles, to be exercised in conformity with the spirit of the law, and in a manner to subserve and not to impede or defeat the ends of substantial justice." ' [Citation.] Exercises of discretion must be ' "grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue." ' [Citation.] Thus, although the abuse of discretion standard is deferential, 'it is not empty.' [Citation.] The standard 'asks in substance whether the ruling in question " 'falls outside the bounds of reason' " under the applicable law and the relevant facts.' " (*People v. Diaz* (2014) 227 Cal.App.4th 362, 377.)

Evidence is substantially more prejudicial than probative under Evidence Code section 352 if it poses an intolerable " 'risk to the fairness of the proceedings or the reliability of the outcome.' " (*People v. Waidla* (2000) 22 Cal.4th 690, 724.) The "undue prejudice" referred to in Evidence Code section 352 "is not synonymous with 'damaging,' but refers instead to evidence that ' "uniquely tends to evoke an emotional bias against defendant" ' without regard to its relevance on material issues." (*People v. Kipp* (2001) 26 Cal.4th 1100, 1121.) Evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information

not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. (*People v. Scott* (2011) 52 Cal.4th 452, 491.) In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose. (*Ibid*.)

" 'As a rule, the prosecution in a criminal case involving charges of murder or other violent crimes is entitled to present evidence of the circumstances attending them even if it is grim' [citation], and even if it 'duplicate[s] testimony, depict[s] uncontested facts, or trigger[s] an offer to stipulate.' " (*People v. Boyce* (2014) 59 Cal.4th 672, 688.) Although "[t]he jury can, and must, be shielded from depictions that sensationalize an alleged crime, or are unnecessarily gruesome, . . . the jury cannot be shielded from an accurate depiction of the charged crimes that does not unnecessarily play upon the emotions of the jurors." (*People v. Streeter*, *supra*, 54 Cal.4th at p. 238.) " ' "[M]urder is seldom pretty, and pictures, testimony and physical evidence in such a case are always unpleasant" ' [citations], and we rely on our trial courts to ensure that relevant, otherwise admissible evidence is not more prejudicial than probative." (*People v. Gurule* (2002) 28 Cal.4th 557, 624.)

We review claims that the trial court erred in admitting prejudicial evidence under the harmless error standard. (*People v. Watson* (1956) 46 Cal.2d 818, 836; *People v. Alcala* (1992) 4 Cal.4th 742, 773 [applying *Watson* to Evidence Code section 352].) "[A] 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the

absence of the error." (*Watson,* at p. 836.) Probability under *Watson* "does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility." (*People v. Superior Court* (*Ghilotti*) (2002) 27 Cal.4th 888, 918.) Appellate review under *Watson* "focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result." (*People v. Breverman* (1998) 19 Cal.4th 142, 177.)

## B. *Analysis*

We have listened to the 911 recording, and conclude that the trial court did not abuse its discretion admitting it. The recording provided insight into the Arlon employees' observations of Davalos shortly after they discovered him. As a result, the recording corroborated Arlon employees' live testimony and helped the jury evaluate their credibility. The recording also established the timing of events, because two other employees saw Arias return to Arlon before Davalos was found and Chiu called 911. Even if we construed Chiu's statements on the 911 call such as, "He's shot in the back of the head" and, "Where's the paramedics?" as overly emotional, those statements are not "unduly shocking" considering the nature of the crime. (*Boyce*, at p. 688.)

Arias relies on this court's decision in *People v. Diaz*, *supra*, 227 Cal.App.4th 362, to argue the 911 recording "had a marked tendency to appeal to the jurors' sense of

9

sympathy." In *Diaz*, during the defendant's retrial for vehicular manslaughter, the trial court allowed the jury to watch two videos about drunk driving that the defendant had watched during his prior mandatory alcohol education programs. (*Id.* at p. 368.) The trial court previously had reviewed the transcripts of both videos but only watched one of them. (*Id.* at p. 369, fn. 6.) Both videos were over 25 minutes long and included "numerous tearful testimonials from the families of victims of alcohol-related offenses, statements from a prosecutor and a defense attorney concerning the high rates of conviction for such offenses, and statements from a judge to the effect that punishment is needed and is effective for alcohol-related driving offenses." (*Id.* at pp. 365, 370, 375.) In their testimonials, the families of victims described the impact of the victims' deaths. (*Id.* at p. 376.) The videos also included testimonials from individuals jailed for vehicular offenses. (*Id.* at p. 382.) We concluded in *Diaz* that the trial court committed reversible error because the videos "created a substantial danger of inflaming the jury's passions by engendering similar feelings of sympathy for the victims of the charged offenses and their families." (*Id.* at p. 388.) Additionally, the trial court should have viewed both videos before ruling on their admissibility. (*Id.* at p. 379.)

Here, the trial court listened to the 12-minute recording before admitting it into evidence. Unlike *People v. Diaz*, *supra*, 227 Cal.App.4th at p. 376, where the videos depicted families of the victims tearfully discussing the impact alcohol-related offenses had on their lives, Chiu maintained an even tone and was not particularly emotional as he relayed information to the 911 dispatcher and kept count of chest compressions. The videos in *Diaz* contained irrelevant information such as the opinions of attorneys and a

10

judge in another state.  By contrast, the recording here included only the Arlon employees' observations regarding their discovery that Davalos was injured, and in response to the dispatcher's questions.  (*Diaz*, at p. 376.)  Accordingly, the trial court did not abuse its discretion by admitting the 911 recording.

## C.  *Harmless Error*

Even if the trial court erred when it admitted the 911 recording, such error would be harmless under the *Watson* standard because abundant evidence supports Arias's first degree murder conviction.  During the police interview, Arias admitted shooting Davalos.  (See *People v. Covarrubias* (2015) 236 Cal.App.4th 942, 952 [no prejudicial error because the defendant admitted to killing the victim at the accident scene and during a police interview].)  Arias testified that he previously spoke about killing Davalos, and admitted that he thought about killing him a week before doing so.  Davalos was shot with Arias's gun, and the latex gloves contained Arias's fingerprints.  In light of this overwhelming evidence of guilt, we conclude there is no reasonable likelihood Arias would have received a more favorable verdict absent the court's admission of the 911 recording.

DISPOSITION

The judgment is affirmed.

O'ROURKE, J.

WE CONCUR:

HALLER, Acting P. J.

McINTYRE, J.