Filed 2/19/16  P. v. Wilkins CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>SHERRI LYNN WILKINS,<br><br>     Defendant and Appellant. | B256898<br><br>(Los Angeles County<br>Super. Ct. No. YA086025) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Henry J. Hall, Judge.  Affirmed in part, reversed in part and remanded.

Richard C. Neuhoff, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising Deputy Attorney General, Stephanie A. Miyoshi, Deputy Attorney General, for Plaintiff and Respondent.

_____

On an evening in late November 2012, Sherri Wilkins (defendant) sat in her car, drank several alcoholic beverages, and began driving home. Suddenly there was an impact between defendant's vehicle and a pedestrian, Philip Moreno. For over two miles, defendant drove with Moreno atop her car and lodged in the windshield, stopping only when other motorists flagged her down and demanded she pull over. Moreno died from his injuries. A jury found defendant guilty of second degree murder, driving under the influence causing injury, driving with a .08 percent blood alcohol level and causing injury, and leaving the scene of the accident.

At trial, defendant's complete rap sheet was admitted as an exhibit. The rap sheet reflected numerous arrests and several convictions, including for offenses such as drug possession crimes, prostitution, and thefts. We conclude admission of the rap sheet was prejudicial error requiring reversal of the murder and driving under the influence convictions.

## FACTUAL AND PROCEDURAL BACKGROUND

*Prosecution Evidence*

On the evening of November 24, 2012, Moreno was at the Branch Office bar in Torrance. He left the bar shortly after 11:00 p.m.[1] At around 11:20 p.m., a video surveillance camera from a law firm located near the bar captured the image of defendant's car traveling westbound on Torrance Boulevard with Moreno on the hood of the car. His head was pointing toward the hood of the car; his legs extended up toward the roof.

Shortly after 11:20 p.m., Stephanie Hicks and Ramiro Escalera were passengers in a car driving on Crenshaw Boulevard in Torrance. As the car they were in passed Torrance Boulevard, Hicks saw defendant's car behind her pick up speed (to approximately 45 or 50 miles per hour). Defendant then began swerving from the middle lane to the left lane towards the center median, then back to the right lane. There were no

---

[1] A post-mortem toxicology report revealed Moreno's blood alcohol level was 0.26, which the medical examiner described as "quite high."

businesses on this stretch of road, only a refinery on either side. As Hicks and Escalera continued to watch the swerving car, they noticed there was a man in the windshield. Hicks called 911. She directed the driver in her car to follow defendant. When defendant stopped at a light, Hicks and her companions pulled up next to defendant. They told her to stop and get out of the car.

Several other drivers and bystanders approached. They observed that Moreno was naked below the waist and had no shoes. One witness described him as "impaled in the windshield from below . . . the upper thigh . . . the upper thigh area was in the windshield and the top body was on the hood." His upper body was face down on the hood of the car. Two witnesses offered a towel and a jacket to cover Moreno. One witness recalled Moreno repeatedly asked, "What happened?" and said, "I don't want to die."

Witnesses at the scene heard defendant make statements such as: "I'm in trouble. I'm in trouble. I'm taking him to the hospital. He jumped in front of the car"; "I didn't know what to do. I was trying to get help. This guy just jumped on my car. I was going to take him to the hospital" ; and "I was driving. Driving home. Trying to get to the hospital." One witness testified defendant's statements made no sense because there was no hospital in the area. Another witness thought defendant looked intoxicated because her eyes were bloodshot and she was "mumbling . . . different stories each time." Another testified defendant appeared to be in shock. Defendant at first stood outside her car, then she sat in the driver's seat and lit a cigarette. When one witness asked her not to smoke, defendant responded that she would smoke if she wanted to. Hicks testified police and paramedics arrived approximately four minutes after she called 911. Another witness who called 911 after pulling up next to defendant's stopped car testified police and paramedics arrived 5 or 10 minutes later.

Two police officers who responded to the scene testified at trial. Sergeant Carol Wilk described Moreno as "basically halfway through the windshield," with his legs through the windshield. Defendant was sitting in the car, smoking a cigarette. Officer Jesus Garcia recalled: "[Moreno] was basically wedged into the windshield and sitting on the dashboard of the passenger side of the vehicle. . . . He was kind of in the fetal

position and his head was on the front passenger side fender hood area. And his legs were facing upward toward the top of the windshield on the driver's side."[2] Defendant was crying. Defendant told Wilk that a couple of lights prior to the intersection where she was stopped, Moreno came running out of the bushes and jumped on the hood of the car. Defendant also said she did not know what happened.[3] In his written report, Garcia noted defendant said: " 'He jumped in front of my vehicle. I'm taking him to the hospital. . . . I'm freaking out. I'm in trouble.' "

Portions of defendant's on-scene interviews with police were audio recorded. In the recording, defendant said: "He was just, he was running across the street and then bam, it was a green light. I don't know what the heck happened." Defendant was unable to tell police exactly where the collision occurred. She explained: "I was in shock, I couldn't believe this guy was in my windshield. All of a sudden I felt him in my windshield. . . . I wanted to take him to the hospital because I felt like I could drive faster than you guys could come." She said she was driving "not even 40" and was not going fast. She did not know if Moreno was in the crosswalk, stating: "You know what, it happened so fast . . . All I know is I was driving and bam, he was in my windshield . . . . I just barely saw him."

Defendant initially denied having had anything to drink or taking any drugs. She later said she had consumed a Chelada—a mixture of beer and tomato juice—at around 3:00 p.m. Police administered a preliminary alcohol screening (PAS) test at around 11:49 p.m. The results indicated defendant had a 0.178 blood alcohol

---

[2]     Wilk testified she was on duty "a little bit after 11:20 p.m.," and "at some point" responded to a call. Garcia testified he was on duty "at approximately 11:23 p.m." when he received and responded to a radio call. Wilk arrived within 10 seconds after Garcia and his partner. Another officer testified he arrived at the scene between 11:30 and 11:34 p.m.; Wilk had arrived before him.

[3]     On cross-examination, Wilk testified defendant said she did not see Moreno until he landed "in her car." Wilk also admitted one of defendant's statements was that she was driving along and, "bam, an ass was in her windshield." On cross-examination Garcia testified defendant did not say she was going home or driving to her house.

4

concentration.  The results of a second test showed a blood alcohol concentration of 0.172.  A horizontal gaze nystagmus eye check indicated defendant had alcohol in her system.  Police placed her under arrest.  When informed she was required to take a chemical test to determine how much alcohol was in her system, defendant chose a blood test.  Her demeanor changed from hysterical to angry.  As an officer explained the chemical test, she told him to "shut the fuck up . . . and to get away from her."  At one point, when asked which way she was driving, defendant answered: "I already told you where I thought it happened . . . .  I was heading on Medrona passed 190th, he ran right in front of my fucken [sic] car.  I see an ass in my windshield and now I'm being arrested."

When paramedics arrived at around 11:30 p.m., Moreno was still on the hood of the car.  According to one paramedic who testified at trial, Moreno was "sort of kneeling with his head looking towards the windshield.  He wasn't inside of the windshield, but there was a hole where he could have been."  Moreno was moaning and grasping at something at his ankles.  He was naked from the waist down; his buttocks were in the air.  The paramedic suspected Moreno had internal injuries, he would need an operating room, and time was of the essence.  Paramedics transported him to a trauma center.

Moreno had a large external laceration to his abdomen, as well as lacerations on his head and legs.  Surgery revealed three or four liters of blood in his abdomen.[4]  At that point, Moreno's heart stopped.  Doctors were unable to revive him.  The trauma surgeon on the case determined the major cause of death was a laceration in the superior mesenteric vein, one of the larger veins in the gastrointestinal tract.  Moreno bled to death.  His injuries were consistent with being struck by a vehicle.

The trauma surgeon testified that "a delay in care plays a role in patients who are exsanguinating. . . .  The longer there's a delay the less chance the patient has of surviving."  He did not know the length of any delay in getting Moreno to the hospital, however he added: "I can just tell you that there was a lot of blood in the abdomen and it

---

[4]     The trauma surgeon testified an average person's body holds about five liters of blood.

takes time to get that much blood in the abdomen." He opined that a delay in bringing Moreno to the hospital would contribute to his exsanguination of the superior mesenteric vein, and such delay would play a significant factor in Moreno's ultimate death. The surgeon testified that time is of the essence with injuries such as the ones Moreno suffered. If a patient is allowed to bleed so much that the heart cannot keep up, he or she will die before the bleeding can be adequately controlled. On the other hand, "If you're able to get to a patient who hasn't bled that much, whose heart is able to maintain a blood pressure and a pulse and able to stop that bleeding process you can reverse the . . . difficulty clotting. You can reverse . . . low blood pressure if that is present. So really it's all a matter of getting operative control of the bleeding before the heart stops. And that's all it really is just – it has to do with time. And time is of the essence."

### *Police Investigation*

At an intersection not far from the Branch Office bar, police found a shoe in the westbound number two lane on Torrance Boulevard. They found a matching shoe on the front lawn of an apartment complex west of Torrance Boulevard. The shoes were untied. Police also discovered a pair of pants in the westbound number two lane on Torrance Boulevard. The pants were zipped and belted; the belt buckle was still fastened. Moreno's wallet was still inside the pants pocket. Officers examined the roadway and found no skid marks in that area of Torrance Boulevard. There was also no debris that may have been from a traffic collision, or shattered glass.

Torrance Police Department forensic identification specialist Krishna Patel examined defendant's car at the scene. She observed a reddish stain on the hood of the car, as well as extensive damage to the passenger side hood and windshield of the car. There was also damage to the passenger side front bumper. Inside the car, Patel found four empty beverage containers: an eight-ounce can of Budweiser Chelada and three miniature Absolut vodka bottles. There was a $4 receipt from a liquor store dated November 24th, with a time stamp of 19:21:36.

6

At trial, Patel testified it is common to see shoes or clothing lost during a vehicle and pedestrian collision. She explained that it is possibly due to the massive impact and the force to the victim: "The first things that do come off are the shoes and any lower garments they're wearing." On cross-examination, Patel admitted Moreno's pants had no rips, tears, or damage other than general wear and tear. There was no biological material on the pants or the shoes. However, she testified that in her experience of investigating fatal traffic collisions involving pedestrians, she ordinarily had not noticed damage to garments or shoes. Instead, the items just come off the victim. Patel observed no fiberglass or glass debris in the roadway near where Moreno's pants and shoes were found. There was no transfer of paint from defendant's car to Moreno's pants.

Chemical testing on defendant's blood sample taken at 12:53 a.m. on November 25 indicated a blood alcohol content of 0.15. A Los Angeles County Sheriffs Crime Lab senior criminalist opined defendant's blood alcohol level around the time of the collision was between 0.15 and 0.17. The criminalist's opinion was based on the assumption that defendant consumed one beer at 2:00 p.m. and engaged in a "social drinking pattern which is drinking over a long period of time . . . or a couple of drinks over a long period of time – in this case it's one drink in one hour." The criminalist further opined that defendant was "mentally impaired to operate . . . a motor vehicle safely." She testified that at 0.08 alcohol concentration and above, all individuals are mentally impaired to operate a motor vehicle safely. She described mental impairment as affecting "brain functions, your brain capabilities. So you have perception affected information processing affected, your judgment, your reaction time as well as divided attention. These are the skills we need in order to operate a motor vehicle safely."

On cross-examination, the criminalist admitted that if presented with a hypothetical in which a female driver of a certain weight drank two shots of vodka and a tomato juice and beer beverage five minutes before a collision, she could not calculate the driver's blood alcohol concentration at the time of the collision, based on a 0.15 blood alcohol concentration result two hours later. She explained that with that kind of drinking pattern, it takes up to 90 minutes for a person to reach his or her peak blood

7

alcohol level after he or she stops drinking. Yet, she testified the hypothetical driver could be impaired because she had alcohol in her system and the blood alcohol level could still be rising.

A medical examiner opined Moreno died from traumatic injuries consistent with a vehicle on pedestrian collision. Moreno had abrasions, lacerations, and bruises, but the main injury was abdominal. There were lacerations on the outside and inside of Moreno's abdomen, which caused him to "bleed out." Abrasions on his legs were consistent with being hit by the bumper of a car. The medical examiner testified that pedestrians hit by cars sometimes suffer leg fractures, but not always, depending on the speed of the car. On cross-examination, the medical examiner agreed that the faster the car, the greater the impact to the pedestrian, and the more likely leg fractures would result.

A City of Torrance detective and accident investigator also testified at trial. With respect to pedestrian and vehicle collisions, he testified: "Your center of gravity is mostly around your hip area, lower stomach area. When you're struck by a lower profile vehicle like a Mitsubishi Eclipse [defendant's car] it usually will strike you below your knee, your lower extremities. What happens is this causes a pinwheel action. Your head's going to fly towards the car. If you maybe were in kind of an oh, oh movement and jumped up a little bit just maybe to get out of the way that pinwheel or windmill action could flip you over so your feet would be at the roof of the car." He also explained that when a person is rotating from his feet towards the sky after being hit by a car, a rotational or centrifugal force at work forces things away from the person and, "if your feet are spinning around your pants could easily fall off. Very common the shoes fall off. Sometimes they go flying down the roadway."

The detective could not be absolutely certain of the precise location of the collision. No skid marks, debris in the roadway, or glass pinpointed where the accident may have started. Only the location of the pants and shoes suggested where the collision may have taken place. He also indicated that in the area where defendant drove during the incident, there were gas stations, the Torrance fire department, the Torrance police

8

department, and a hospital with a 24-hour emergency room.[5]  In describing the surveillance video, the detective indicated that at one point on screen, "it appears you can see someone walking" from between a sign and the Branch Office bar and crossing the street, right before defendant's car entered the frame.

On cross-examination, the detective acknowledged there were no moving violations attributed to the manner in which defendant was driving her car.  He also admitted it was his opinion that defendant was not traveling at an excessive speed.  He could not definitively say that a movement visible in the surveillance video from Torrance Boulevard showed a person walking.  He also could not rule out the possibility that Moreno jumped on top of defendant's car, or that defendant's account was accurate that Moreno appeared out of nowhere and was suddenly "in her windshield."

As it turned out, Moreno's brother-in-law knew defendant.  She was the brother-in-law's counselor in a drug and alcohol program at the Twin Town treatment center.  He recalled defendant had told him and others that she quit drinking because she feared that if she ever drank again she would kill someone or end up in jail.  The brother-in-law admitted on cross-examination that the first time he told anyone about defendant's statement was when he appeared on a television talk show.

### 2010 Traffic Incident

In May 2010, defendant was involved in a traffic incident in which she collided with a utility pole.  Defendant had to drive onto the sidewalk to hit the pole.  Police responding to the scene found a downed power pole and power lines.  Although defendant had left the scene, a trail of engine fluid led police to her home two or three blocks east of the collision site.  At the house, police observed a truck with significant damage at its front end.  Defendant was detained after she admitted she owned the truck and had been in a collision.  She appeared unsteady, lethargic, and had slurred speech.  Blood testing revealed the presence of benzodiazepines in defendant's blood, but no

---

[5]     The detective opined on the specific route he believed defendant took after colliding with Moreno.  The route was 2.2 miles.

9

intoxicants such as opiates, barbiturates, or cocaine. Benzodiazepines are typically used to treat anxiety, insomnia, and seizures. The blood test also detected cannabinoids, however the inactive metabolite for marijuana can stay in the bloodstream for weeks after use of the drug. Although defendant was arrested on charges including driving under the influence of drugs and being under the influence of a controlled substance, the charges were later dismissed.

### *Defense Evidence*

Several witnesses who knew defendant through her work as a drug and alcohol counselor testified on her behalf. They testified defendant was honest, compassionate, and a good counselor, but she panicked or froze under pressure. They denied ever hearing defendant say that if she ever drank again she would end up killing someone. One witness testified that type of statement was often said in the counseling program, as a generality. These witnesses also explained that the training certified alcohol or drug abuse counselors receive on driving under the influence concerns the effects of drugs and alcohol on the brain and body, including how such substances impact the body's ability to function properly.

A defense medical expert opined a person of defendant's weight who had consumed the food she had eaten the night of the collision, and the alcohol she consumed at 11:00 p.m., would have a blood alcohol concentration of only 0.04 or 0.05 at the time of the collision. The expert also concluded Moreno's superior mesentery vein was under pressure due to an enlarged spleen and was at risk of bleeding. According to the expert, Moreno was very drunk and, had he fallen onto any object, he could have ruptured the vein.

A defense forensic scientist testified the damage on defendant's bumper was consistent with hitting a tire stop in a parking lot. He indicated a vehicle would have to drive 60, 70, or 80 miles per hour to knock off the shoes of a pedestrian in a collision. Typically clothing is not blown off when a car is moving at a speed of around 35 miles per hour. If pants moved so quickly off a victim's body, one would expect to see frictional or striation marks on the body. There were no such marks on Moreno.

10

The expert further opined that clothing and shoes knocked off by an impact would tend to travel in the same direction, rather than being spread apart. If a car had enough force to knock off a victim's pants, one would also expect damage to the ankles and legs, such as shattered bones. If the bumper damage were the result of the collision, he would expect to see a lot of damage on the lower portion of the pedestrian's body. When the lower body is hit, it would tend to cause the upper body to go forward head first and, depending on the speed of the vehicle, the pedestrian would either hit the windshield head first, or launch over the vehicle head first. The expert thus opined Moreno was not on his feet at the time of the impact. Based in part on the assumption that Moreno's buttocks were in the windshield, and his understanding that Moreno suffered no lower body damage or bone fractures, the expert concluded the most probable explanation of the collision was that Moreno attempted to jump over the vehicle.

The expert calculated that if Moreno was slowly running across Torrance Boulevard when he attempted to jump over the vehicle, defendant would have had only 1.6 to 2.8 seconds to avoid the collision. Yet it would have taken an unimpaired person around 3.6 seconds to perceive, react, and brake to avoid hitting Moreno. Thus, he concluded "there was insufficient time based upon the behavior of Mr. Moreno darting out in the street and the ability of [defendant] who was traveling at about the speed limit to avoid this collision." The expert disagreed with the prosecution expert's testimony that if a car hit a pedestrian in the middle or lower portions of the leg, the pedestrian would rotate around his center of gravity.

Defendant testified on her own behalf. In November 2012, she had been employed at the Twin Town treatment center as a certified drug and alcohol counselor for 19 months. Her certification training included learning about what alcohol did to the body and the brain, but she had no specific licensing regarding alcohol consumption. She knew driving drunk is dangerous to human life. She denied saying if she were ever to drink again she would kill someone. She had previously been a heroin addict, and had not abused alcohol before. She had said in a group counseling session, "jails, institutions, or death," but it was merely a statement from the book of Alcoholics Anonymous.

When defendant was 15 years old she was involved in a traffic collision that damaged her feet, legs, ankle, back, and arm. She eventually began using heroin to cope with the pain. As of November 2012, she was on a methadone maintenance program. However, at the time of the incident, she was waiting for a knee replacement; her legs and ankles were in "pretty bad" condition. She was in physical pain and was self-medicating with alcohol. She entered a period of relapse at the end of October.

Around 11:00 p.m. on November 24, 2012, defendant left work, went to her car, lit a cigarette, and drank the alcohol she had purchased earlier—the miniature vodka bottles and the Chelada. She drank the four drinks in around 15 minutes and began driving home. After 30 or 40 seconds of driving she saw a flash coming onto her car, then she saw buttocks a little bit inside her windshield. She didn't see anyone running, only a flash. It seemed to her that Moreno "came from the sky." She was "very confused." She thought it might be a prank and felt Moreno's skin to see if she really had a naked body on her car. She was "very afraid" because the event was "very shocking and very strange" and she did not know what was going on. She felt she was in danger because she did not know what had happened. She also did not think "it was real." She was afraid because "[a]nything could have been going on. I mean, he's a pretty big guy. I didn't know what if somebody was after him or what the hell was he – I just couldn't figure out what was going on. And I didn't think that – I never thought I hit him. I didn't hit him with my car." Instead she felt "like he fell into the windshield from up high."

Defendant explained she continued driving because she was scared, she wasn't thinking straight, and she "just kind of froze." She denied driving over the speed limit or jerking her car back and forth. She did not think she swerved her car towards the median, but admitted it was hard to see. She denied feeling the effects of the alcohol she had consumed. She described her memory from that night as being "really blurry," not from the alcohol, but because she could not believe what had happened. She denied telling a police officer Moreno had jumped out of some bushes. She denied intending to flee the scene and denied she was driving home. She testified she "vaguely" remembered telling people after she stopped that she was trying to take Moreno to the hospital.

Defendant explained the damage to the bottom part of the bumper on her car was from running into the tire stop in a parking lot. On cross-examination she denied being drunk at the time of the incident. While driving home she was thinking she needed to hurry up and get home before the alcohol began to affect her. She insisted she did not hit Moreno: "I didn't see that I hit him in front of the windshield. He just came down on me." She testified that it felt like she was only driving a few second before she pulled over, and she did so when she saw someone else validate that "this was real."

### *Verdict and Sentence*

The jury found defendant guilty of second degree murder (Pen. Code, § 187, subd. (a); count 1); driving under the influence causing injury (Veh. Code, § 23153, subd. (a); count 2); driving with a 0.08 percent blood alcohol level causing injury (Veh. Code, § 23153, subd. (b); count 3); and leaving the scene of an accident (Veh. Code, § 20001, subd. (a); count 4). As to counts two, three, and four, the jury found true the allegation that defendant personally inflicted great bodily injury upon Moreno within the meaning of Penal Code section 12022.7. The jury also found true the allegations that defendant had suffered two prior strikes based on two previous burglary convictions (Pen. Code, §§ 459; 667, subds. (a)(1), (b)-(i), & 1170.12, subds. (a)-(d).)

The trial court sentenced defendant to a total prison term of 55 years to life. This appeal timely followed.

## DISCUSSION

### I. Admission of the Entire CLETS[6] Printout was Prejudicial Error Requiring Reversal of Counts 1, 2, and 3

The trial court admitted People's Exhibit 103, which was a CLETS rap sheet listing defendant's arrests and convictions from 1980 through the offense charged in the instant case. We agree with defendant that admission of the complete CLETS printout was error requiring reversal.

---

[6] California Law Enforcement Telecommunications System (CLETS).

## A. Background

There were several discussions of defendant's prior convictions before trial, concerning whether the trial on the prior conviction allegations would be bifurcated and to what extent evidence of the prior convictions would be admitted to impeach defendant's credibility. In a trial brief, the People moved to impeach defendant with four prior convictions: 1989 and 1994 convictions for burglary (Pen. Code, § 459); a 1992 conviction for petty theft with a prior (Pen. Code, § 666); and a 2002 conviction for bringing a controlled substance into a jail or prison facility (Pen. Code, § 4573). The information also alleged defendant had suffered two prior strikes based on the burglary convictions.

The court initially ruled the priors trial would be bifurcated. The court also ruled that if defendant testified, the People would be allowed to impeach her with evidence of "all of her felony convictions going back to [a 1982] forgery conviction . . . ." The court excluded evidence of convictions in 1998 and 2001 for violations of Penal Code section 4573, bringing a controlled substance into a jail or prison facility, concluding they were not crimes of moral turpitude. However, during trial, and after discerning the defense intended to rely on statements defendant made about the incident, the court suggested it would reconsider the previous ruling and allow evidence of the prior convictions to impeach the defendant's statements, rather than limiting the impeachment to defendant's trial testimony.

The court then asked how the People intended to prove the Penal Code section 666 prior convictions that dealt with honesty and veracity. The prosecutor stated the People could offer a certified rap sheet as admissible evidence of prior conduct. A certified rap sheet had previously been marked as Exhibit 103, outside the presence of the jury. Defense counsel objected to the People proving up the priors with the certified rap sheet, arguing it would be more prejudicial than probative. A portion of defense counsel's comments also appeared to be directed to the trial court's tentative decision not to bifurcate the priors trial.

14

The court indicated it had conducted "a very careful Evidence Code section 352 balancing." The court then ruled it would allow the People to prove in its case in chief the prior convictions that formed the basis of the prior conviction allegations, and the Penal Code section 666 prior convictions that would impeach the credibility of defendant's statements.

In the discussion that followed, one of the prosecutors described the documentary evidence he would use to prove the prior convictions. He explained he was removing pages from the 969(b) packet to use in the process. As the prosecutor proposed this procedure, the following colloquy ensued:

"Court: Given the – or understanding that there is a continuing objection to this, I'm not going to make you object every five minutes. Does that procedural approach, is that agreeable to you? Again, recognizing that you're objecting, and I want to make sure that the record reflects you are preserving any and all objections?
[Defense counsel]: I would just say I understand that's the way that the People are going to proceed. I am in no way agreeable with it, but I understand that's the way they are going to proceed.
[Court]: Okay. Very well.
[Prosecutor]: It's as opposed to putting on the entire 969(b) package which we are trying to avoid."

Thus, through the selected pages of the 969(b) packet, and the testimony of a district attorney's office assistant, the People offered evidence of the 1992 petty theft with a prior conviction, the 1989 first degree residential burglary conviction, and the 1994 first degree burglary conviction. Exhibit 103 was not used to question witnesses. At the close of the People's case the court admitted the People's exhibits, including Exhibit 103, without additional defense objection.

In closing argument, the prosecutors mentioned defendant's prior convictions, but explained: "[T]he prior convictions don't prove her guilt . . . . [D]on't use that to prove that she is guilty. Just because she has prior felony convictions, doesn't mean she is guilty of this. . . . You use the prior convictions two ways. Before you find her guilty, to evaluate how credible her testimony was yesterday. After you find her guilty, then you

15

look at those prior conviction sheets, Exhibits 100 and 101 to determine if the evidence proves . . . she was convicted of those crimes."

Exhibit 103 is an 11-page document detailing defendant's criminal history from 1980 through 2012, including arrests and convictions. It listed 16 different names for defendant and other identifying details, such as tattoos. The printout reflected arrests, charges that were dismissed, and convictions.

## B. Analysis

### i. Forfeiture

On appeal, the People assert defendant failed to preserve her objection for appellate review because she objected to the admission of the complete CLETS printout, but did not press for a ruling. (See *People v. Valdez* (2012) 55 Cal.4th 82, 142-143.) We decline to find the argument forfeited. Defense counsel explicitly objected to the use of the rap sheet to prove the prior convictions. The discussion and rulings that followed did not explicitly address the defense objection to the use of the CLETS printout.[7] But the court acknowledged defense counsel had a "continuing objection," and that she was preserving "any and all objections," which would appear to have encompassed the use of the rap sheet to prove up defendant's priors. In context, it appears the trial court overruled all of defense counsel's objections, which would include the objection to the use of the CLETS printout. Given the state of the record, we decline to find defendant forfeited the objection by failing to press for a ruling.

---

[7]     The court's statements in fact suggest it intended to exclude evidence of some of defendant's prior convictions. For example, the court explained: "[T]he charges of the priors are all theft-related and do not involve intoxication or injury to another person. The ones that involve the possession of controlled substances in prison I ordered excluded, and I'm not going to change that portion of the order. I don't think that they constitute crimes involving moral turpitude necessarily, so they're not coming in anyway."

16

**ii. Error**

On the record before us it is difficult to pinpoint exactly what confluence of factors led to the rap sheet being admitted into evidence. As noted above, defense counsel objected to the use of the rap sheet to prove up defendant's prior crimes. The trial court appeared to overrule defense counsel's objections, yet, the court's statements also indicated it intended to exclude some of the prior crimes for use as impeachment. As a result, the court could not have intended to admit the entire, unredacted CLETS printout. Further, while the prosecution initially suggested the rap sheet could be used to prove up the priors, in the end the method used to prove defendant's prior crimes did not involve the rap sheet at all. However it is clear the eventual admission of the CLETS printout into evidence was error, regardless of the source of that error.

The CLETS printout contained pages of highly prejudicial and inadmissible evidence, including evidence of prior arrests that did not result in convictions. (*People v. Williams* (2009) 170 Cal.App.4th 587, 609-610 (*Williams*).) The rap sheet displayed at least 28 different arrests, detentions, or citations between 1980 and 2012. According to the printout, in 1980, defendant was arrested, detained, or cited on charges of forging a prescription and was convicted on two counts. In 1982, she was arrested, detained, or cited on charges of possession of a controlled substance, injuring a place of confinement, and forging or altering a narcotic prescription. She was convicted on one count of forging or altering a narcotic prescription. No disposition was identified on the other charges. In 1986, she was arrested on charges of receiving known stolen property. She was not prosecuted due to lack of probable cause or evidence. In 1987, defendant was arrested, detained, or cited on charges of prostitution at least four times, possessing a narcotic or controlled substance for sale twice, at least one charge of petty theft, and "loiter at adult school: molest pupils." That year she suffered two prostitution convictions. One drug possession charge was dismissed. No disposition was identified for the other charges. In 1988, defendant was arrested, detained, or cited on charges of robbery, burglary and grand theft twice, grand theft auto, and prostitution. She was not prosecuted on one burglary charge for lack of sufficient evidence. The auto theft charge

17

was dismissed, as was the prostitution charge. No disposition was identified for the other robbery, burglary, and grand theft charges. In 1989, defendant was arrested on charges of vehicle theft, prostitution at least once, possessing a controlled substance, possessing drugs or alcohol in prison or jail, possessing a hypodermic needle or syringe, and petty theft. One prostitution charge was dismissed, as was one charge of possessing drugs or alcohol in a prison facility. That year, she suffered a conviction for possessing drugs or alcohol in a prison facility, and a conviction for first degree burglary. In 1990, defendant was arrested, detained, or cited for transporting or selling a controlled substance. No disposition of the charge was listed.

The following year, 1991, brought charges for theft of personal property, possession of a controlled narcotic substance, and providing a false identification to specific peace officers. The latter charge was dismissed; no disposition was listed for the theft charge. In 1992, defendant was convicted on the possession of a controlled substance charge. She was also arrested, detained, or cited in 1992 for petty theft with a prior and giving a false identification. She was convicted of petty theft with a prior. In 1993, defendant was arrested, cited, or detained for use/under the influence of a controlled substance. The charge was dismissed in 1994, however, later that year defendant was arrested for burglary and was convicted. In 1998, she was arrested, detained or cited for bringing alcohol or drugs into a prison facility; she was convicted on the charge in 1999. In 2001, she was again arrested, detained, or cited for bringing a controlled substance into prison and was convicted. There was also a charge for criminal conspiracy that was later dismissed. The remaining two entries on the printout were the 2010 incident in which defendant hit the power pole, and the instant charges.

It is well established that "evidence of mere arrests that do not result in convictions is inadmissible because such evidence invariably suggests the defendant has a bad character." (*Williams, supra,* 170 Cal.App.4th at p. 609, fn. omitted.) Mere arrests generally may not be used to impeach a witness. (*People v. Monterroso* (2004) 34 Cal.4th 743, 778; *People v. Medina* (1995) 11 Cal.4th 694, 769; *People v. Anderson* (1978) 20 Cal.3d 647, 650.) Further, the rap sheet reflected more convictions than were

18

actually used to impeach defendant, including convictions for misdemeanors such as prostitution and drug possession. The trial court had previously concluded some of the prior convictions reflected in the rap sheet were not crimes of moral turpitude, and therefore could not be used to impeach defendant. (See e.g., *People v. Castro* (1985) 38 Cal.3d 301, 317 [simple possession of heroin not a crime of moral turpitude].) The rap sheet as an unredacted whole was not admissible.

On appeal, the People argue a certified rap sheet is admissible in some circumstances. The cases the People rely on for this proposition illustrate that no such circumstances were present in this case. In *People v. Martinez* (2000) 22 Cal.4th 106, a certified CLETS printout was not inadmissible hearsay when offered to prove, at a bench trial, that a defendant served prior prison terms for prior felony convictions. Likewise, in *People v. Morris* (2008) 166 Cal.App.4th 363, 365, 367, the court considered the admissibility of a CLETS rap sheet as proof of alleged prison priors, in the face of an objection that the rap sheet was not reliable, or was testimonial hearsay, at a court trial. Neither case considered the issue here, which was the admission of a complete CLETS rap sheet, *to the jury*, when that rap sheet contained evidence of numerous arrests, convictions not serving as the basis for prior crimes allegations, and convictions not admissible for impeachment purposes. We are aware of no authority finding a CLETS rap sheet admissible under such circumstances.

"Evidence of uncharged offenses 'is so prejudicial that its admission requires extremely careful analysis. [Citations.]' [Citations.] 'Since "substantial prejudicial effect [is] inherent in [such] evidence," uncharged offenses are admissible only if they have *substantial* probative value.' [Citation.]" (*People v. Ewoldt* (1994) 7 Cal.4th 380, 404.) There was no such substantial probative value in Exhibit 103 when admitted as an unredacted whole. Even if some portions of the document were relevant, the printout was

more prejudicial than probative under an Evidence Code section 352 analysis.[8] The admission of Exhibit 103 into evidence was error.

### iii. Prejudice

However, such error is not necessarily reversible. "We evaluate error in the admission of prior crimes evidence using the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836, [299 P.2d 243] (*Watson*), under which we determine whether it was 'reasonably probable that a result more favorable to defendant would have resulted' had the prior crimes evidence not been admitted. [Citation.]" (*Williams, supra,* 170 Cal.App.4th at p. 612; *People v. Partida* (2005) 37 Cal.4th 428, 439.) Under the circumstances of this case, there is a reasonable probability that defendant would have obtained a more favorable result on counts 1, 2, and 3 had Exhibit 103 not been admitted at trial.[9] (*People v. Merriman* (2014) 60 Cal.4th 1, 69.)

The evidence in this case was highly contested on several key aspects, rendering defendant's credibility and character of significant importance. For example, there was no direct prosecution evidence establishing how defendant was driving before or at the moment of the impact, including how fast she was driving. There was no direct evidence regarding the moment of the collision, except defendant's testimony. No direct evidence offered by the People explained how Moreno came to be in the street at the moment of the collision. The surveillance video from Torrance Boulevard was of poor visual quality and not definitive. While there was evidence defendant had to drive at least 60 or 70

---

[8] Under Evidence Code section 352, the trial court may exclude evidence "if its probative value is substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice. . . . For this purpose, ' "prejudicial" means uniquely inflammatory without regard to relevance.' [Citation.] 'Evidence is substantially more prejudicial than probative [citation] if . . . it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome" [citation].' [Citation.]." (*People v. Lindberg* (2008) 45 Cal.4th 1, 49; Evid. Code, § 352.)

[9] Defendant argues the error rendered her trial fundamentally unfair, thus violating her right to due process and mandating review under *Chapman v. California* (1967) 386 U.S. 18, 24. We do not reach this issue because we conclude that even under the *Watson* standard, reversal is required.

20

miles per hour to knock off Moreno's clothes, there was also evidence that an impact at such speeds would likely have broken Moreno's legs. Defendant claimed she was driving under 40 miles per hour. The prosecution evidence did not eliminate the possibility that, as the defense expert testified, Moreno entered the roadway in such a manner that the collision was unavoidable, whether or not defendant was impaired.

Further, the evidence regarding defendant's blood alcohol concentration at the time of the collision was disputed. The prosecution expert admitted that if defendant had consumed a significant amount of alcohol all at once, she could not calculate defendant's blood alcohol concentration at the time of the collision. The defense expert on this topic opined the driver's blood alcohol concentration at the time of the collision would have been well under the legal limit. The extent of defendant's impairment at the time of the collision was contested. Defendant testified she did not feel the effects of the alcohol as she was driving home; her actions suggested otherwise. Resolution of these issues depended in part on whether the jury believed defendant's testimony regarding when she consumed the alcohol, and her recollection of its effect on her.

Similarly, while the evidence was sufficient to allow the jury to find defendant guilty based on her act of fleeing the scene and driving with Moreno ensconced in the windshield, that finding was not inevitable. Under the prosecution's theory, defendant drove fewer than three miles before she stopped. There was testimony that time is of the essence in treating internal injuries such as those Moreno sustained. Yet, the evidence was not overwhelming that, on their own, defendant's relatively brief acts of fleeing, continuing to drive, and failing to call police, were a substantial factor in causing Moreno's death.

Defendant's story, supported to some degree by the defense expert witnesses, was that despite consuming alcohol minutes before she began driving, she was not driving recklessly or in a highly dangerous manner. In defendant's version of the evidence, Moreno encountered her car in such a way that she could not have avoided the collision, under any circumstances, and therefore she could not be held liable for second degree murder, or for violating the law or failing to perform a duty that caused Moreno's

injuries. Had the jury believed defendant's testimony or her statements at the scene, the result at trial would have been different. At a minimum, the jury may have concluded defendant lacked the mental state necessary for murder.

The People argue the admission of Exhibit 103 was harmless because there was no testimony or reference to the document, and we have no indication the jury even viewed the exhibit. We disagree. Exhibit 103 went to the jury. The jurors were instructed to examine whatever exhibits they thought would help in the deliberations. As defendant points out on appeal, the jury was also instructed to consider all the evidence that was received throughout the entire trial when deciding whether the People had proved the case beyond a reasonable doubt. The same instruction explained the term "evidence" included the exhibits admitted into evidence. We have no basis to speculate that the jury did not actually look at an exhibit that was available to them in the jury room and was identified as evidence they were to consider.

This was a case in which defendant's credibility and character played a significant role. Exhibit 103 contained highly prejudicial information that served no permissible purpose. The jury knew defendant had a history of drug addiction and that she had committed serious crimes in the past. But the admission of Exhibit 103 added to the picture a suggestion that defendant had a history of unpunished crimes, a propensity for crime, and it counteracted her attempts to portray herself as having turned her life around until the charged crime. (*People v. Holt* (1984) 37 Cal.3d 436, 459 [while there was no way to make defendant appear as "anything but a crook, even he was entitled to rules of evidence which keep prejudice in bounds. The improper evidence effectively destroyed whatever credibility [he] had."].) The long list of arrests and convictions created a significant risk that the jury would improperly infer that whether or not defendant was criminally liable for killing Moreno, she had committed other crimes, she would commit crimes in the future, and she posed a danger to society in general and should be punished. (*People v. Albarran* (2007) 149 Cal.App.4th 214, 230.) We conclude it is reasonably probable defendant would have received a more favorable result had Exhibit 103 not been admitted. (*People v. Anderson, supra,* 20 Cal.3d at p. 651.) Under the

22

circumstances of this case, admission of the complete rap sheet mandates reversal of counts 1, 2, 3.

### iv. Count 4

However, to the extent defendant contends the conviction on count 4—violating the duty to stop at the scene of an injury accident—must also be reversed, we disagree. The evidence was overwhelming and undisputed that defendant was involved in a vehicle accident; the accident caused the death of Moreno; defendant knew she had been involved in an accident that injured another person; and she willfully failed to immediately stop at the scene of the accident and failed to provide reasonable assistance to Moreno. (Veh. Code, § 20001, subd. (a); *People v. Harbert* (2009) 170 Cal.App.4th 42, 52-53; CALCRIM No. 2140.) Although defendant told witnesses at the scene that she was taking Moreno to a hospital, these statements were undermined by her failure to stop at medical and emergency facilities in the area where she was driving. In addition, defendant did not testify at trial that she continued driving after the accident because she was taking Moreno to a hospital. Instead she testified that she panicked and simply kept driving. At trial, defendant only "vaguely" remembered even stating that she was taking Moreno to the hospital. In light of the undisputed evidence regarding the incident, including all of the defense evidence, the jury could not reasonably have concluded anything other than that defendant was guilty of violating Vehicle Code section 20001.

Defendant also argues the trial court prejudicially erred in excluding evidence that she was addicted to heroin when she committed the prior crimes that were proved to the jury. Even if this were error, we would not find it prejudicial as to count 4 for the reasons expressed above. As to count 4, we also reject the arguments that the trial court erred by failing to sua sponte instruct the jury on self-defense or necessity; neither theory was supported by evidence sufficient to warrant an instruction. (*People v. Mentch* (2008) 45 Cal.4th 274, 288.) On the night of the incident, defendant said Moreno ran in front of the car, jumped on the car, or she did not see him. She did not mention fear of attack by Moreno as a justification for hitting him with her car. Further, the evidence was overwhelming that as soon as the collision took place, Moreno was entirely helpless.

23

There was no evidence to support a finding that defendant left the scene of the collision and failed to render assistance out of any honest and reasonable belief that she needed to defend herself. (*People v. Iraheta* (2014) 227 Cal.App.4th 611, 620.) Likewise, there was no substantial evidence to support a finding on the elements of necessity, such as that the accused must entertain a good faith and objectively reasonable belief that her act was necessary to prevent a greater harm, a harm she did not substantially create.[10] (*People v. Trippet* (1997) 56 Cal.App.4th 1532, 1538.)

We therefore reverse the convictions on counts 1, 2, and 3. We need not address defendant's argument regarding the causation instruction.

## II. Substantial Evidence Supported the Jury's Findings on the Second Degree Murder Charge

Although we conclude the erroneous admission of defendant's complete CLETS rap sheet requires a reversal of the judgment as to her convictions for second degree murder and the felony driving under the influence causing injury charges, we must also address defendant's challenge to the sufficiency of the evidence to support those convictions to determine whether she may be retried for those offenses. (*People v. Grant* (2003) 113 Cal.App.4th 579, 594.) The evidence was sufficient to support the jury's guilty verdicts on counts 1, 2, and 3.

---

[10] We also do not reverse the Penal Code section 12022.7 great bodily injury enhancement the jury found true as to count 4. "A great bodily injury allegation may attach [to a Vehicle Code section 20001, subdivision (a) conviction] when the injury was caused or aggravated by the defendant's failure to stop and render aid." (*People v. Valdez* (2010) 189 Cal.App.4th 82, 90.) Moreover, application of the enhancement does not require that the defendant intend to inflict great bodily injury. (*People v. Elder* (2014) 227 Cal.App.4th 411, 424.) Under any standard, any erroneous evidentiary ruling was not prejudicial as to the great bodily injury enhancement attached to count 4. Similarly, the prior strike allegations as to count 4 were not disputed at trial and are affirmed.

### A. Substantial Evidence of Causation and Implied Malice

Defendant asserts there was no evidence establishing "any malicious act or omission by [defendant] caused Mr. Moreno's death," as required for the second degree murder conviction. She additionally contends there was no evidence to support a finding of implied malice. We disagree. To evaluate the sufficiency of the evidence, we must review the entire record in the light most favorable to the judgment for evidence that is reasonable, credible, and of solid value, that would allow a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt. We resolve all conflicts in the evidence and credibility questions in favor of the verdict. (*People v. Canizalez* (2011) 197 Cal.App.4th 832, 841 (*Canizalez*).)

#### i. Causation

"In homicide cases, a 'cause of the death of [the decedent] is an act or omission that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act or omission the death of [the decedent] and without which the death would not occur.' [Citation.] In general, '[p]roximate cause is clearly established where the act is directly connected with the resulting injury, with no intervening force operating.' [Citation.]" (*People v. Cervantes* (2001) 26 Cal.4th 860, 866.) "To be considered the proximate cause of the victim's death, the defendant's act must have been a substantial factor contributing to the result, rather than insignificant or merely theoretical." (*People v. Briscoe* (2001) 92 Cal.App.4th 568, 583-584, fn. omitted.) However, "[t]he prosecution does not have to prove to a mathematical certainty that the killing would have occurred absent the defendant's act." (*Canizalez*, at p. 845.)

There was substantial evidence to support a finding that defendant's conduct was a substantial factor in causing Moreno's death. Although defendant presented evidence intended to show that Moreno leaped or fell onto her car, there was also contradictory evidence indicating she in fact hit him with the car. Defendant's own statements to police on the night of the incident included multiple statements that Moreno ran in front of her car. There was also evidence of defendant's blood alcohol concentration at the time of the collision, and evidence that such a level would have rendered her impaired

and affected her reaction time. Despite defendant's argument that Moreno may have rushed in front of her or jumped on her car, there was evidence she did not brake hard or stop. Rather than attempt to render any aid to Moreno, defendant testified she simply touched his skin, unable to tell if he was real. After touching him, she still kept driving. The jury reasonably could have interpreted this testimony as further evidence that defendant's powers of perception, judgment, and reaction time, were significantly impaired. Her decision to continue driving after the collision suggested consciousness of guilt, as did her statements that she was "in trouble," and her false statements about her alcohol consumption that night. (*People v. Leon* (2015) 61 Cal.4th 569, 607; *People v. Fritz* (2007) 153 Cal.App.4th 949, 959.) Based on this evidence, the jury could reasonably conclude that defendant hit Moreno with her car as he attempted to cross the street because she was too impaired to react in time to avoid him.

Further, even in the absence of definitive evidence regarding how the collision occurred, there was evidence that defendant's subsequent conduct was a substantial factor in causing Moreno's death. After the collision, defendant drove several miles with Moreno stuck on or in her windshield. She did not stop. She did not call 911. Meanwhile, Moreno was in the process of bleeding to death on the hood of her car. There was evidence that with injuries such as those Moreno suffered, time is of the essence. By failing to stop and render any assistance for over two miles and several minutes, defendant deliberately prevented Moreno from receiving emergency medical care in a time-critical situation. This evidence supported a finding that the delay in Moreno's treatment was not insignificant or theoretical. (*People v. Jennings* (2010) 50 Cal.4th 616, 643.) Despite the relatively short period of time that passed before defendant was compelled to stop her car, the jury could reasonably conclude defendant's failure to stop earlier was a substantial factor in causing Moreno's death.

### ii. Implied malice

We also conclude the evidence supported a finding of implied malice. " 'Malice is implied when the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who

26

knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " [Citation.] In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another . . . .' [Citation.]" (*People v. Cravens* (2012) 53 Cal.4th 500, 507.) "[C]ourts have identified factors relevant for upholding a murder conviction based on drunk driving: '(1) a blood-alcohol level above the .08 percent legal limit; (2) a predrinking intent to drive; (3) knowledge of the hazards of driving while intoxicated; and (4) highly dangerous driving.' [Citation.]" (*People v. Batchelor* (2014) 229 Cal.App.4th 1102, 1114; *People v. Watson* (1981) 30 Cal.3d 290; *People v. Moore* (2010) 187 Cal.App.4th 937, 942 [implied malice to be decided in light of all the circumstances; that some cases have factors not present in the instant case not determinative]; *People v. Olivas* (1985) 172 Cal.App.3d 984, 989.)

There was sufficient evidence of implied malice in this case. Defendant consumed four alcoholic beverages before driving home. There was evidence this was enough to impair her physical and mental faculties. There was evidence that at the time of the collision, defendant's blood alcohol level was 0.14 or 0.15, over the .08 percent legal limit. She knew she was preparing to drive as she consumed the drinks. (*People v. Watson, supra,* 30 Cal.3d at pp. 300-301.) Defendant was also a certified drug and alcohol counselor. She admitted at trial that part of her training for the certification included education on the effects of alcohol on the brain and body. This, plus her experience in the area of helping rehabilitate those with substance abuse problems, was sufficient to allow the jury to infer she was aware of the hazards of driving while intoxicated. (*Id.* at p. 300; *People v. Covarrubias* (2015) 236 Cal.App.4th 942, 948; *People v. Batchelor, supra,* 229 Cal.App.4th at p. 1115.) Indeed, she testified at trial that she knew drunk driving was dangerous to human life.

As explained above, the evidence did not establish the precise sequence of events that led to Moreno being lodged on or in the windshield. However, what evidence there was created an inference that defendant was in fact driving recklessly, and, following the collision, she continued to do so. The jury could conclude that her failure to see Moreno at all before hitting him, her failure to brake, and her failure to stop indicated she was

driving in a highly dangerous manner. Even if defendant's failure to see Moreno before the collision was not the result of her impaired state, the jury could reasonably conclude everything that followed the moment of impact was highly dangerous driving. (See *People v. Cravens, supra,* 53 Cal.4th at p. 511 [defendant's conduct after fatal fistfight bolstered finding of implied malice]; *Canizalez, supra,* 197 Cal.App.4th at p. 844 [defendant's actions after a fatal crash caused by his street racing were circumstantial evidence of his subjective awareness of the risk of death caused by his actions and his indifference to its consequences].) Defendant did not brake hard or stop, but continued to drive. She later began swerving between the traffic lane and median. One possible interpretation of this behavior was that she was trying to shake Moreno off the car. Meanwhile, as explained above, Moreno was bleeding to death from his injuries.

There was sufficient evidence for the jury to conclude defendant acted with conscious disregard of life and with wanton disregard of the near certainty that Moreno would be killed by the combination of her actions. (*People v. Johnigan* (2011) 196 Cal.App.4th 1084, 1092.)

## III. Substantial Evidence Supported the Convictions for the Alcohol-Related Driving Felonies

The jury found defendant guilty of violating Vehicle Code section 23153, subdivision (a) and Vehicle Code section 23153, subdivision (b), both of which render it unlawful to drive under the influence and cause bodily injury to another.[11] "The elements of DUI causing injury are '(1) driving a vehicle while under the influence of an alcoholic beverage [or drug][or, under subdivision (b), while having 0.08 percent or

---

[11]  Vehicle Code section 23153, subdivision (a) provides: "It is unlawful for a person, while under the influence of any alcoholic beverage to drive a vehicle and concurrently do any act forbidden by law, or neglect any duty imposed by law in driving the vehicle, which act or neglect proximately causes bodily injury to any person other than the driver." Vehicle Code section 23153, subdivision (b) provides, in relevant part: "It is unlawful for a person, while having 0.08 percent or more, by weight, of alcohol in his or her blood to drive a vehicle and concurrently do any act forbidden by law, or neglect any duty imposed by law in driving the vehicle, which act or neglect proximately causes bodily injury to any person other than the driver."

28

more, by weight, of alcohol in the blood]; (2) when so driving, committing some act which violates the law or fails to perform some duty required by law; and (3) as a proximate result of such violation of law or failure to perform a duty, another person was injured.' [Citation.]" (*People v. Walker* (2014) 231 Cal.App.4th 1270, 1275.) " ' "To satisfy the second element, the evidence must show an unlawful act or neglect of duty *in addition* to driving under the influence." [Citation.]' [Citation.] 'The unlawful act or omission "need not relate to any specific section of the Vehicle Code, but instead may be satisfied by the defendant's ordinary negligence. [Citations.]" ' [Citation.]" (*People v. Givan* (2015) 233 Cal.App.4th 335, 349.)

On appeal, defendant contends there was insufficient evidence to support a finding that she committed an act which violated the law or failed to perform a duty required by law that proximately caused Moreno's injuries. We disagree. The jury was instructed the People were alleging defendant failed to perform two legal duties while driving her vehicle: the duty to exercise ordinary care at all times and to maintain proper control of the vehicle. There was evidence establishing that, while driving under the influence of alcohol, and with a greater than 0.08 percent blood alcohol level, defendant collided with Moreno. The jury could reasonably conclude defendant hit Moreno as he was crossing the street, and she failed to see him, avoid the collision, or stop her car because of her impairment. She then drove for several miles while Moreno was stuck on the windshield and hood of her car. Defendant did not stop, call for help, or render aid, violating Vehicle Code section 20001, subdivision (a), as reflected in the jury's conviction on count 4. Moreno bled to death. There was evidence that with such internal injuries, time is of the essence, and a delay in receiving medical treatment can be fatal. These facts supported a conclusion that defendant failed to exercise ordinary care at all times, and that failure proximately caused Moreno's injuries and death. (*People v. Weems* (1997) 54 Cal.App.4th 854, 863.)

## IV.   Conclusion

We therefore reverse the judgment as to counts 1, 2, and 3 due to the erroneous admission of defendant's entire rap sheet.  We have rejected defendant's arguments that the convictions were not supported by substantial evidence.  As a result, the prosecutor is not precluded from retrying defendant.  The conviction on count 4 stands.

## DISPOSITION

Defendant's convictions on counts 1, 2, and 3 are reversed.  The matter is remanded to the superior court for further proceedings consistent with this opinion.  In all other respects, the judgment is affirmed.

BIGELOW, P.J.

We concur:

FLIER, J.

GRIMES, J.